RECEIVED
SDNY PRO SE OFFICE
2026 FEB 26 PM 1:42

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN T. MITCHELL, Plaintiff, -AGAINST- DETECTIVE TIMOTHY KRAFT AND THE CITY OF NEW YORK Defendants. | SECOND AMENDED COMPLAINT AND JURY DEMAND Docket: 25-cv-10065 |

Stephen T. Mitchell, as and for his complaint against the named defendants above, alleges as follows:

## PRELIMINARY STATEMENT

1. This case is a civil rights action arising from Plaintiff's arrest and prosecution without probable cause based upon fabricated evidence and the knowing reliance on a cognitively impaired complainant in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

2. On or about September 27, 2022 Plaintiff, Stephen T. Mitchell, was arrested in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

3. Stephen T. Mitchell was detained, incarcerated, and arraigned on the same day as his arrest. He was released after his arraignment and appeared in court at least twice after arraignment to defend against the charges. The criminal case against him was dismissed by the state voluntarily on December 5, 2022.

4. Defendant Detective Timothy Kraft arrested the Plaintiff and initiated his prosecution.

5. Defendant Kraft arrested the Plaintiff as part of a "collars for dollars" scheme. He used a fraudulent arrest of the Plaintiff to enhance his overtime pay.[1]

6. Detective Kraft violated the Plaintiff's federal civil rights. His misconduct was with malice because the arrest and initiation of criminal prosecution was for a non-law enforcement purpose; enhancing the detective's overtime pay.

7. Defendant City of New York is liable to Stephen T. Mitchell in this case on Monell grounds because Plaintiff's injuries were caused by longstanding New York Police Department policies, practices, and a failure to train, supervise, and discipline police officers regarding the use of schemes that enable them to enhance their overtime pay by the use of fraudulent arrests.[2]

8. The aforesaid failings by the City of New York were the moving force behind the misconduct of Detective Kraft.

9. This is an action to recover compensatory and punitive damages and an award of costs and attorneys' fees for violations of Stephen T. Mitchell's rights secured by 42 U.S.C. §§1983 and 1988 and by the United States Constitution including the Fourth and Fourteenth Amendments because of the Defendants misconduct and manufacture of known false evidence that resulted in the needless arrest, detainment, and incarceration of the Plaintiff.

---

[1] See Cordero v. City of New York, 282 F.Supp.3d 549, 555-556 *2 (E.D.N.Y. 2017)(collars for dollars).

[2] Id.

## THE PARTIES

10. The Plaintiff is Stephen T. Mitchell, a person of African-American descent and a resident of New York City.

11. The Defendant, Timothy Kraft, was a New York City police detective assigned to investigate Stephen T. Mitchell sometime between September 18, 2022 and September 28, 2022. Defendant Kraft continued to advance an unlawful prosecution of the Plaintiff through December 5, 2022.

12. The municipal Defendant is the City of New York. Defendant City of New York is a municipal entity responsible for NYPD policies, training, supervision, and discipline.

13. Defendant City of New York is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City and the State of New York, and having the powers and duties imposed by law thereon.

## JURISDICTION AND VENUE

14. This Court has original subject matter jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§1331 and 1343, this being an action seeking redress for the violation of Plaintiff's federal constitutional and civil rights.

15. Venue is proper for this court pursuant to 28 U.S.C. §1391(b).

## JURY DEMAND

16. Stephen T. Mitchell hereby demands a trial by jury for all issues raised by this complaint.

## FACTUAL ALLEGATIONS

17. On or about September 17, 2022 Sidney Browne asked his nephew, Stephen T. Mitchell, to make a deposit in Mr. Browne's bank account. Mr. Mitchell was

in possession of a certified check made to Mr. Browne for $2,500.00 that Mr. Browne asked to be deposited to his account on or about September 17, 2022.

18. Sidney Browne was born in May 1936. He was 86 years old in September 2022.

19. Stephen Mitchell was in possession of Mr. Browne's bank card on September 17, 2022 and he had Mr. Browne's permission to use the card to make bank deposits and withdrawals at Mr. Browne's instruction.

20. Plaintiff frequently executed banking transactions for Sidney Browne at Mr. Browne's request between 2019 and 2022. Mr. Browne was disabled and not capable of walking easily to the bank to get cash or engage in basic banking transactions. The Plaintiff, his nephew, did this for him on several occasions for a three-year period of time often using his bank card at an ATM machine.

21. Stephen Mitchell used Mr. Browne's bank card to deposit the aforesaid $2,500.00 check into Mr. Browne's account by making the deposit at an ATM located at 2831 Broadway in Manhattan on or about September 17, 2022.

22. Stephen Mitchell then gave Mr. Browne a copy of the deposit slip he received from the ATM verifying the deposit.

23. The deposit was made on a weekend and because of such it did not register with statements of deposit received over the telephone for several days after the deposit.

24. Mr. Browne called his bank to check if Stephen T. Mitchell made the deposit early in the week after the deposit was made and became alarmed because the deposit had not registered with the statement of deposit information he received over the telephone.

25. Mr. Browne accused Stephen T. Mitchell during a telephone conversation early in the week after the deposit was made of stealing the $2,500.00 he instructed Mr. Mitchell to deposit in his account. Stephen T. Mitchell denied stealing the money and reminded Mr. Browne that he was in possession of a copy of the deposit slip for the $2,500.00.

26. Mr. Browne continued to accuse Stephen T. Mitchell of stealing his money; Stephen T. Mitchell denied stealing the money and never made any physical threats to Mr. Browne.

27. In spite of the fact that he was in possession of the deposit slip Mr. Browne called the police on or about September 19, 2022 and accused Stephen Mitchell of stealing $2,500.00.

28. The statement of deposit of $2,500.00 was reported via the telephone by the following mid-week after the September 17, 2022 deposit. A record of the aforesaid deposit easily was available before the date of Mr. Mitchell's arrest made on or about September 27, 2022.

29. Plaintiff alleges, on information and belief, that Detective Timothy Kraft interviewed Plaintiff's uncle, Sidney Browne, between September 19, 2022 and December 5, 2022.

30. Plaintiff alleges that at all relevant times during Mr. Browne's initial encounter(s) with Detective Kraft Mr. Browne suffered from advanced stages of dementia. He was afflicted with memory impairment and loss, hallucinations, and diminished cognitive capacity.

31. Plaintiff further alleges that all of the aforesaid afflictions were apparent to a reasonable observer during any extended conversation with Mr. Browne at the time of his encounters with Detective Kraft.

32. Plaintiff further alleges that at all relevant times during Mr. Browne's encounter(s) with Detective Kraft Mr. Browne suffered from obvious mental and physical impairments that would indicate to a reasonable police detective his cognitive loss and/or deficiency and render him an unreliable witness. Detective Kraft knew or deliberately disregarded these concerns.

33. Mr. Browne suffered a stroke a few years before he met with Detective Kraft. His arm repeatedly spasmed uncontrollably during conversation after the stroke and this condition was manifest at times contemporaneous with his encounters with Detective Kraft. Mr. Browne's speech often slurred because he had lost control of his facial muscles and this condition was manifest at times contemporaneous with his encounters with Detective Kraft. Mr. Browne also suffered from memory lapses during discussion that were apparent during regular conversation and this condition was manifest at times contemporaneous with his encounters with Detective Kraft.

34. Detective Kraft said he visited Mr. Browne in his home for his initial encounter. The detective disregarded the fact that Mr. Browne resided in an SRO that also served as an assisted living facility for elderly people. The detective also disregarded that Mr. Browne was limited physically and could not leave his apartment without assistance. He required a health aid, personal supervision, and frequent medical care because of his mental and physical disabilities.

35. The detective also ignored the fact that there was security at Mr. Browne's SRO and that Mr. Mitchell would not have access to Mr. Browne's apartment

unless Mr. Browne gave his nephew permission to enter past the security on the first floor and take an elevator upstairs to his apartment. The security in Mr. Browne's apartment stopped all visitors at a front desk and, as a practice, called Mr. Browne to announce he had a visitor and gain his permission before allowing the visit.

36. The detective also ignored the fact that at Mr. Browne's SRO the security officials and his health aid agencies had documented histories of Mr. Browne making numerous false accusations of theft and threats of physical abuse. Information regarding Mr. Browne's history of making false accusations of theft and threats of physical abuse was available to Detective Kraft upon his initial encounter with Mr. Browne.

37. On or about September 26, 2022 Detective Timothy Kraft visited the home of the Plaintiff during evening hours with another detective or police officer. The Defendant Detective Timothy Kraft informed Plaintiff of the charge of alleged theft by Sidney Browne and instructed Plaintiff to report to his police precinct the next morning.

38. Mr. Mitchell heeded Detective Timothy Kraft's direction and reported to the precinct before the time Detective Kraft scheduled for him to appear at the precinct the morning of September 27, 2022. Upon his appearance Plaintiff was arrested, jailed, and eventually presented to 100 Centre Street in Manhattan for arraignment. Detective Kraft delivered the Plaintiff for arraignment by a precinct car with bars that he drove from the police station.

39. The Plaintiff detailed Mr. Browne's dementia and mental infirmities to Detective Kraft throughout his detainment prior to the detective visiting prosecutors to draft and sign a criminal complaint to initiate criminal

proceedings. Mr. Mitchell repeatedly told the detective of Mr. Browne's mental infirmities before he was arraigned.

40. Notwithstanding his awareness of Mr. Browne's mental infirmities and unreliability as a witness Detective Kraft authored charges to the Assistant District Attorney against the Plaintiff on or about September 27, 2022 purporting Plaintiff verbally threatened Mr. Browne over the telephone on or about September 19, 2022; approximately eight days before he arrested the Plaintiff.

41. Mr. Browne resided approximately two miles from the Plaintiff at the time of the alleged threat and lived in a building with a security force that prevented unwanted visitors from having access to his apartment.

42. The alleged verbal threat never occurred. Plaintiff never verbally threatened his uncle on the telephone, or anywhere else, at any time. Detective Kraft's claim was false and the detective knew or should have known the claim was false when he told the prosecutors of it.

43. The alleged threat was made on or about September 19, 2022 and reported to the detective at that time. The detective unreasonably and imprudently waited seven days before investigating the Plaintiff and improvidently waited eight days before arresting the Plaintiff for an alleged serious verbal physical threat.

44. Detective Kraft bitterly complained to Plaintiff while Plaintiff was detained that because of the covid epidemic his overtime pay opportunities diminished and he was under financial duress because without the overtime pay it was difficult to keep up his mortgage payments and other bills he was responsible for.

45. Plaintiff was released from detainment at the conclusion of his arraignment sometime at or near 9 p.m. He had to re-visit Detective Kraft at the precinct because upon his arrest the detective took Plaintiff's keys and wallet. Plaintiff visited Detective Kraft in the late evening, after his arraignment, to retrieve essential property.

46. Defendant Kraft ignored the mandatory vouchering of personal property under NYPD Patrol Guide 218-01. This failure allowed him to "off-book" seize Plaintiff's keys and wallets to create a "tether" between the officer and the arrestee and thereby fabricating a necessity for the detective to remain on duty for excessive, unearned overtime hours.

47. Plaintiff was required to return to court at least twice during a three-month period of time while criminal charges were pending. This obligation constituted an unlawful and unconstitutional seizure of his person. Plaintiff was obligated to take on the burden of preparing a defense. He was terrified with each court visit.

48. Finally, on December 5, 2022 criminal charges against the Plaintiff were dismissed by the court because the New York County District Attorney's Office failed to advance the prosecution.

49. Plaintiff alleges the false threat allegation was used in order to arrest Plaintiff on September 27, 2022 as a pretext for a part of a baseless investigation. The criminal charges were made so that the Plaintiff would be compelled to go through the arrest process and the initial stages of a criminal prosecution.

50. Detective Kraft used the arrest of the Plaintiff as part of a scheme to acquire overtime pay. He withheld the Plaintiff's keys and wallet so the Plaintiff would

have to see him after arraignment. This maneuver ensured that Detective Kraft had a claim for overtime because he worked a twelve-hour (or more) shift.

51. It also was clear and easily discernable that the Plaintiff made the deposit of his uncle's funds as he had promised and there was no theft. Mr. Brown was limited physically and could not walk the streets unescorted. Further, there was security at his apartment building that would not have allowed his nephew to visit his apartment if he did not want to see him.

52. Detective Kraft either reviewed or had ready access to bank records that would have refuted Mr. Browne's claims of theft prior to Mr. Mitchell's arrest. The detective had access to these records the moment he met with Mr. Browne. Mr. Browne had a copy of the deposit slip during their first meeting.

53. The detective also had access to information regarding the September 17, 2022 deposit during the week before the Plaintiff was arrested. The bank records reflected the September 17, 2022 by telephone within a few days after the deposit and several days before Plaintiff's arrest. The detective ignored this information. No reasonable police detective or officer could conclude a theft occurred in light of the evidence and information available from Mr. Browne's bank records prior to Mr. Mitchell's arrest.

54. Further, no reasonable police officer would have believed Mr. Browne's claim of a physical threat from his sixty-six year old nephew was viable because of the security force protecting his apartment.

55. Mr. Mitchell also informed the detective the bank records reflected the deposit during the arrest process before the detective met with the prosecutors.

56. Detective Kraft saw Mr. Browne's fraudulent complaint against his nephew as an opportunity to make an arrest that could contribute to his quest for additional overtime pay. He ignored investigating and collecting exculpatory evidence prior to Mr. Mitchell's arrest in order to ensure he would collect overtime pay by effecting the arrest and initiating prosecution.

57. The detective lacked probable cause to arrest Plaintiff on the basis of the false or incompetent verbal threat charge and he knew it.

58. A rudimentary investigation by the detective also would have challenged the credibility of any claims made by Mr. Browne regarding verbal threats made by his nephew. If the detective had performed the type of basic investigation expected of a detective by discussing Mr. Browne's allegations with the security at Mr. Browne's residence he would have discovered there were numerous other false reports by Mr. Browne of people stealing from him or harming him when, in fact, nothing was stolen and he never was harmed. He would have acknowledged Mr. Mitchell would not have had access to Mr. Browne without getting past security at the apartment. The detective also would have confirmed Mr. Browne's dementia and the unreliability of any claims he made that property was stolen from him or that he was threatened with harm.

59. There were several days between the time of Detective Kraft meeting Mr. Browne for the first time and Mr. Mitchell's arrest. Detective Kraft easily could have investigated and debunked Mr. Browne's alleged claims of theft or verbal threat in that time.

60. Detective Kraft caused the arrest and incarceration of the Plaintiff on or about September 27, 2022. Detective Kraft, with malice, caused a criminal complaint to be lodged against the Plaintiff for a non-law enforcement purpose, obtaining overtime, knowing the charges were reliant on false or incompetent evidence.

61. The detective ignored exculpatory proof, made an arrest, and initiated prosecution based upon statements he fabricated or knew or should have known were false or incompetent for a non-law enforcement purpose: to enhance his income by collecting overtime for the arrest of the Plaintiff without probable cause. The detective complained about overtime reductions and financial pressures during the arrest process evidencing non-law-enforcement motives.

**COUNT I**

**MALICIOUS PROSECUTION**

**AND A**

**VIOLATION OF 42 U.S.C. §1983 AND THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS AGAINST DEFENDANT KRAFT**

62. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

63. Defendant Detective Kraft initiated, or caused to be initiated, a criminal proceeding against Plaintiff by falsely or incompetently asserting that one Mr. Browne had filed a charge of Aggravated Harassment.

64. Defendant Kraft acted with actual malice and without probable cause, knowing that the allegations against Plaintiff were fabricated or incompetent and lacked any factual basis in law or fact.

65. Defendant Kraft intentionally forwarded this fabricated or incompetent information to the District Attorney's office, misleading the prosecutor and the court to ensure the commencement of criminal proceedings.

66. Defendant's primary motive for initiating said proceedings was a non-law enforcement purpose; the fraudulent inflation of his own overtime compensation, rather than the pursuit of justice. Detective Kraft complained about his diminished overtime to the Plaintiff during the arrest process. He also engaged in maneuvers, such as holding the Plaintiff's house keys and wallet while Plaintiff was incarcerated during the arrest process to enhance his overtime compensation.

67. As a direct and proximate result of Defendant's misconduct, Plaintiff suffered a significant deprivation of liberty, including:

- Initial arrest and physical incarceration;
- The imposition of restrictive conditions of release;
- Mandatory court appearances over a three-month period;
- Emotional distress and humiliation, deprivation of liberty, emotional trauma, and the ongoing burden of a fraudulent prosecution.

68. The criminal proceedings terminated in Plaintiff's favor when the case was dismissed for failure to prosecute in its entirety on December 5, 2022.

69. By reason of the foregoing, Defendant Kraft, acting under color of state law, violated Plaintiff's rights under the Fourth and Fourteenth Amendments to be free from unreasonable seizure and the deprivation of liberty without due process of law.

## COUNT II

## FABRICATION OF EVIDENCE

## AND A

## VIOLATION OF 42 U.S.C. §1983 AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS AGAINST DEFENDANT KRAFT

70. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

71. Defendant Detective Kraft, acting in an investigative capacity under color of state law, knowingly and deliberately fabricated evidence against Plaintiff.

72. Specifically, Defendant Kraft created a false narrative in a criminal complaint and official police records and reports by claiming that Mr. Browne had asserted a charge of Aggravated Harassment against Plaintiff, when in fact no such charge was made or no such charge was made by a witness Detective Kraft knew to be competent.

73. Defendant Kraft forwarded this known false and/or incompetent information to the District Attorney's Office, intending for it to be used as the legal basis for a criminal prosecution.

74. The fabricated evidence was material to the proceedings; it was not only likely to influence a jury's verdict but was the primary instrument used to sustain the prosecution and justify the Plaintiff's continued detention and court-ordered appearances.

75. The fabrication of evidence was the proximate cause of Plaintiff's deprivation of liberty, as the prosecution would not have been initiated or maintained in the absence of Defendant Kraft's fraudulent claims.

76. Defendant Kraft's actions were motivated by an illicit personal and non-law enforcement purpose—to secure additional overtime compensation—and were taken with reckless disregard for Plaintiff's constitutional rights.

77. By fabricating evidence and injecting it into the judicial process, Defendant Kraft violated Plaintiff's Fourteenth Amendment right not to be deprived of liberty based on manufactured evidence.

**COUNT III**

**DENIAL OF CONSTITUTIONAL RIGHT TO A FAIR TRIAL**

**AND A**

**VIOLATION OF 42 U.S.C. §1983 AND**
**THE FOURTEENTH AMENDMENTS TO THE**
**UNITED STATES CONSTITUTION**
**AS**
**AGAINST DEFENDANT KRAFT**

78. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

79. Defendant Detective Kraft, while acting in an investigative capacity and under color of state law, deliberately and knowingly fabricated information. Specifically, Defendant Kraft falsely reported that Mr. Browne asserted a charge of Aggravated Harassment against Plaintiff.

80. Defendant Kraft forwarded fabricated and/or incompetent information to prosecutors at the District Attorney's office.

81. The fabricated or incompetent information was of a nature likely to influence a jury's verdict or the decision-making of a prosecutor, as it formed the sole basis for the criminal charges filed against Plaintiff.

82. Defendant Kraft knew at the time of fabrication that the information was false or incompetent and that its use would result in an unjustified prosecution.

83. As a direct and proximate result of this fabrication or incompetence and the subsequent forwarding of known false or incompetent evidence, Plaintiff suffered a deprivation of liberty, including his initial incarceration and the ongoing burden of defending against a fraudulent criminal case for three months.

84. Defendant Kraft's conduct was malicious, willful, and in reckless disregard of Plaintiff's clearly established constitutional rights.

85. By creating and using false and/or incompetent evidence to initiate and sustain a criminal proceeding, Defendant Kraft denied Plaintiff his right to a fair trial and due process of law under the Fourteenth Amendment to the United States Constitution.

## COUNT IV
## UNREASONABLE SEIZURE
## AND A
## VIOLATION OF 42 U.S.C. §1983 AND THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS AGAINST DEFENDANT KRAFT

86. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

87. Under the Fourth Amendment, Plaintiff had a clearly established right to be free from unreasonable seizures and from the unlawful extension of a seizure without probable cause.

88. Defendant Detective Kraft initiated a seizure of Plaintiff's person through an arrest and subsequent detention based entirely on fabricated or incompetent allegations of Aggravated Harassment.

89. Defendant Kraft further extended the duration of this seizure by providing false or incompetent information to the prosecutor, which directly resulted in the court imposing restrictive conditions of release and mandatory court appearances.

90. For a period of three months, Plaintiff remained "seized" within the meaning of the Fourth Amendment, as he was forced to answer to criminal proceedings and was restricted in his liberty and travel under the threat of further incarceration.

91. This seizure was extended beyond what was necessary for any legitimate law enforcement purpose; it was maintained solely because Defendant Kraft intentionally misled the judicial system to satisfy a personal financial motive—the accumulation of overtime pay.

92. There was no probable cause to support the initial arrest or the three-month continuation of legal proceedings.

93. As a direct result of Defendant's misconduct, Plaintiff suffered a prolonged deprivation of liberty, emotional trauma, and the ongoing burden of a fraudulent prosecution.

## DENIAL OF EQUAL PROTECTION OF THE LAWS AND A VIOLATION OF 42 U.S.C. §1983 AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS AGAINST DEFENDANT KRAFT

94. Plaintiff, an African American male, incorporates all preceding factual allegations.

95. Defendant Kraft's arrest of Plaintiff was not a good-faith error but was motivated by racial animus. Kraft has a documented history of civilian complaints involving offensive language related to race and ethnicity, as well as substantiated misconduct for abuse of authority. This history demonstrates a predisposition to target minority individuals and disregard their constitutional protections. The City of New York demonstrated a deliberate

indifference to this record and made no effort to train or supervise Detective Kraft when it manifested.

96. Defendant Kraft admitted to Plaintiff that he was "struggling financially" due to the loss of COVID-related overtime. Kraft targeted Plaintiff, an African American man, to remediate his personal finances to enable a manufactured arrest.

97. Kraft escalated a non-criminal family dispute into a full custodial arrest. By seizing Plaintiff's keys and wallet and detaining him for several hours before transport, Kraft intentionally triggered the administrative requirements of a formal arrest to secure a twelve-hour overtime payout.

98. Kraft's discriminatory intent is further evidenced by his refusal to view the bank deposit slip, which provided immediate physical proof of Plaintiff's innocence. Kraft also refused to heed Plaintiff's assertions that his uncle was incompetent. Detective Kraft also failed to acknowledge that Plaintiff would be unable physically to harm his uncle because of the security in Mr. Browne's apartment. Plaintiff would not be able to visit his uncle without his permission.

99. Despite the "open and obvious" signs of Mr. Browne's dementia (slurred speech, spasms, and lack of cogency), Kraft allegedly chose to rely solely on his statements to justify an arrest. Kraft leveraged the vulnerability of an elderly person with cognitive impairments to facilitate a predatory arrest of an African American male for personal financial gain.

100. The City of New York is liable for maintaining a system that incentivizes "collars for dollars" arrests, which disproportionately affects African American citizens, as demonstrated by the NYPD's history of civil rights payouts and the specific actions of Defendant Kraft.

## COUNT VI

## CLAIM FOR PUNITIVE DAMAGES

101. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

102. The actions of Defendant Detective Kraft were willful, wanton, and exhibited a reckless and callous indifference to the Plaintiff's federally protected constitutional rights.

103. Defendant Kraft acted with actual malice and a corrupt motive, specifically fabricating criminal allegations against an innocent citizen for the illicit purpose of fraudulently inflating his personal overtime compensation.

104. Such conduct constitutes a gross abuse of police power and an intentional subversion of the judicial system for private financial gain.

105. Defendant Kraft's conduct was so outrageous and egregious that it shocks the conscience and warrants the imposition of punitive damages in an amount sufficient to punish him and to deter other law enforcement officers from engaging in similar misconduct in the future.

## COUNT VII

## THE MONELL CLAIM AGAINST THE CITY OF NEW YORK

106. Plaintiff, an African American male, incorporates all preceding factual allegations.

107. At all times material hereto, Defendant City of New York (the "City"), through the New York Police Department (NYPD), maintained a de facto policy, custom, and widespread practice of incentivizing and rewarding officers for making arrests on a pre-planned schedule to maximize overtime compensation, a practice commonly known within the NYPD as "Collars for Dollars."

108. The Defendant City of New York has been on notice for decades of a widespread custom known as "Collars for Dollars," wherein NYPD officers, including Detective Kraft, manipulated the timing of arrests and the duration of processing to maximize overtime pay.

109. This practice was explicitly documented as early as the **Mollen Commission Report (1994)**, which found that officers "falsify arrest reports... to ensure overtime pay," a practice that has persisted unabated due to a lack of meaningful municipal oversight.[3]

110. The City received further notice of this specific practice in Cordero v. City of New York, 282 F. Supp. 3d 549 (E.D.N.Y. 2017), where the Court held that allegations of "collars for dollars" were sufficient to state a *Monell* claim

[3] Please see excerpt from Mollen Commission Report (pages 36-43).

because the practice was "so manifest as to imply the constructive acquiescence of policy-making officials."

111. Despite the ruling in *Cordero*, the City failed to implement a "red flag" system to audit arrests—like the Plaintiff's—where a voluntary surrender at 9:00 AM inexplicably results in 12+ hours of processing time ending at 9:00 PM.

112. The City, as a matter of policy and practice, failed to properly train and supervise its officers, including Defendant Kraft, regarding the mandatory vouchering of personal property under **NYPD Patrol Guide 218-01**. This failure allowed officers to "off-book" seize property—such as keys and wallets—to create a "tether" between the officer and the arrestee, thereby fabricating a necessity for the officer to remain on duty for excessive, unearned overtime hours.

113. The detective withheld the Plaintiff's keys and wallet instead of vouchering them through the process outlined by the patrol guide ensuring a "tether"; Plaintiff would be compelled to return to the precinct to see Detective Kraft after the evening arraignment to go home guaranteeing the detective justification for overtime compensation.

114. NYPD Patrol Guide 218-01 requires officers to "invoice" (voucher) a prisoner's personal property for **safekeeping**. By not vouchering them and instead keeping them in his personal possession, Kraft bypassed the official system designed to protect the Plaintiff's property and ensure its return.

115. In effect Detective Kraft created a hostage situation. Kraft forced Plaintiff to return to him specifically after his release by retaining the keys personally.

This "constructive seizure" extended his control over Plaintiff and his property beyond any legitimate law enforcement need.

116. Holding the keys until 9:00 PM allowed Kraft to claim he was still "processing" or "investigating," thereby justifying 12+ hours of overtime pay for a simple voluntary surrender. This is evidence of **bad faith**.

117. Detective Kraft's failure to provide Plaintiff with a Property Clerk Invoice (Voucher) at the time of the arrest, violated a clearly established administrative and constitutional requirement to provide a receipt for seized goods.

118. Mr. Mitchell alleges that Detective Kraft created a "tether" between himself and Plaintiff by the maneuvers he engaged during Plaintiffs arrest process. The arrest never was or could be supported by corroborative evidence. Kraft ensured Plaintiff was put through Central Booking late enough to guarantee he would be released in the evening, at a time guaranteeing overtime for the detective.

119. The City had actual or constructive notice of this practice through numerous prior lawsuits, public reports, and internal audits.

120. Specifically, the City was aware that police officers routinely delay the processing of "voluntary surrenders" to ensure the processing spans a full 12-hour double shift.

121. Police officers also often bypass the Property Clerk Invoice (PCI) system to maintain personal control over an arrestee's property, ensuring the officer—and only that officer—can facilitate the release of property, thus "justifying" their continued presence on the clock.

122. The City had notice, through prior CCRB complaints and IAB investigations, that officers "off-book" seize home keys and wallets to create a "property tether." This ensures the arrestee must return to the specific officer's custody, thereby "necessitating" the officer remain on duty and accrue overtime.

123. The **OIG-NYPD Report on Litigation Data (2018)** highlighted that the City's failure to track "lost or delayed property" claims prevents the identification of officers who use property retention as a tool for overtime fraud.

124. The City demonstrates deliberate indifference by allowing supervisors to sign off on overtime "Trip Sheets" (Form PD439-141) for "Arrest Processing" without verifying why a 9:00 AM voluntary surrender required a detective to remain on duty until 9:00 PM.

125. This lack of supervision was the "moving force" behind Detective Kraft's belief that he could seize Plaintiff's keys without a voucher, store them in an unauthorized location (such as a locker), and stay on the clock for 12 hours without consequence.

126. The City's failure to implement a tracking system that correlates arrest-to-voucher time versus overtime hours billed constitutes deliberate indifference to the Fourth and Fourteenth Amendment rights of citizens.

127. This custom and practice was the "moving force" behind Detective Kraft's decision to:

(a) Instruct Plaintiff to surrender at 9:00 AM;
(b) Illegally seize Plaintiff's keys "off-the-books" without a voucher;
(c) Fabricate the necessity of a 12-hour processing window; and
(d) Withhold property until after 9:00 PM to secure a 12-hour overtime payout.

128. The City demonstrated deliberate indifference by failing to audit Property Clerk Invoices (PCI) against overtime "Trip Sheets" (Form PD439-141). This systemic failure allowed Detective Kraft to withhold Plaintiff's keys until 9:00 PM to secure a 12-hour overtime shift.

129. The City has a custom of failing to investigate allegations of fabricated evidence.

130. In Garnett v. Undercover Officer C0039, 838 F.3d 209 (2d Cir. 2016), the Second Circuit affirmed that the right to be free from prosecution based on fabricated evidence is clearly established.

131. The City's continued failure to track or discipline officers for "testilying" or narrative fabrication is a form of deliberate indifference to federal constitutional violations of the rights of the accused.

132. In this case Detective Kraft's transforming a "theft" call or report into a "harassment" arrest directly caused Plaintiff's injury by pretextually charging Plaintiff with a crime the detective knew or should have known the Plaintiff did not commit.

133. The City of New York is liable for maintaining a system that incentivizes "collars for dollars" arrests, which disproportionately affects African American citizens, as demonstrated by the NYPD's history of civil rights payouts and the specific actions of Defendant Kraft.

134. Defendant Kraft's arrest of Plaintiff was not a good-faith error but was motivated by racial animus. Kraft has a documented history of civilian complaints involving offensive language related to race and ethnicity, as well as substantiated misconduct for abuse of authority. This history demonstrates a predisposition to target minority individuals and disregard their constitutional protections.

135. The City of New York demonstrated a deliberate indifference to Kraft's record regarding the African-American constituents he encountered and made no effort to train or supervise Detective Kraft when his racially hostile sentiments and actions manifested.

136. As a direct and proximate result of the City's policies, customs, and deliberate indifference, as discussed above, Plaintiff's Fourth and Fourteenth Amendment rights were violated and he suffered a deprivation of liberty and property without due process of law.

## PRAYER FOR RELIEF PURSUANT TO 42 U.S.C. §1983

WHEREFORE, Plaintiff STEPHEN T. MITCHELL demands judgment against the above-captioned Defendants as follows:

1. For compensatory damages of two million five hundred thousand dollars ($2,500,000.00) for the untoward, illegal, and unconstitutional physical detention and incarceration, loss of liberty, emotional distress, humiliation, and damage to reputation caused by the unlawful arrest and detention;
2. For punitive damages against the individual Defendant Kraft of one million dollars ($1,000,000.00) to punish his reckless disregard for Plaintiff's constitutional rights and to deter future "collars for dollars" schemes;
3. For declaratory relief a declaration that the acts and omissions of the Defendants', described herein, violated Plaintiff's rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution.

4. For reasonable attorneys' fees, expert witness fees, costs of the litigation, and disbursements under 42 U.S.C. §§ 1983 and 1988 and other applicable laws;
5. For pre-and post-judgment interest as allowed by law; and
6. For such other relief as this Court deems just and proper.

VERIFICATION

I affirm under the penalties of perjury pursuant to 28 U.S.C. §1746 that the aforesaid statements are true and correct to the best of my ability.

Dated: February 25, 2026

Stephen T. Mitchell
461 Central Park West Apt. 6B
New York, NY 10025
STM7615@aol.com

# MOLLEN COMMISSION EXCERPTS

**What follows are excerpts from Chapter 4, "Perjury and Falsifying Documents" (pages 36-43; emphasis added) of:** ***The City of New York Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department, Commission Report. July 1994.***

---

# Perjury And Falsifying Documents

*"Oh what a tangled web we weave when first we practice to deceive."* – Sir Walter Scott

....

A police officer's word is a pillar of our criminal justice system. On the word of a police officer alone a grand jury may indict, a trial jury convict, and a judge pass sentence. The challenge we face in combating police falsifications is not only to prevent the underlying wrongdoing that spawns police falsifications, but to eliminate the tolerance the Department and the criminal justice system exhibit about police who fail to tell the truth.

Our investigation into this form of corruption focused on a number of manifestations of the problem, including: testimonial perjury, as when an officer testifies falsely under oath before a grand jury or at a court proceeding; documentary perjury, as when an officer swears falsely under oath in an affidavit or criminal complaint; and falsification of police records, as when an officer falsifies the facts and circumstances of an arrest in police reports. We will collectively refer to these various kinds of wrongdoings as "falsification."....

*Our investigation indicated [that falsification] ... is probably the most common form of police corruption facing the criminal justice system, particularly in connection with arrests for possession of narcotics and guns.* Several officers also told us that the practice of police falsification in connection with such arrests is so common in certain precincts that it has spawned its own word: "testilying."

...Officers know that the operation of the criminal justice system itself usually protects them from having to commit testimonial perjury before a grand jury or at trial. The vast majority of charges for narcotics or weapons possession crimes result in pleas without the necessity of grand jury or trial testimony....

Unlike other patterns of police corruption, greed is often not the primary motive behind police falsification. While the desire for overtime pay and career advancement sometimes encourage falsification ... [police officers also] commit falsification to serve what they perceive to be "legitimate" law enforcement ends – and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested....

To explain how and why they were present in a particular premises or came to arrest a particular person, *officers manufactured facts*. For example, to justify an unlawful raid on a drug den where money or drugs were stolen, a common tale was that the officers entered the location in hot pursuit or on information from an unidentified informant. *To justify unlawfuly searching and arresting a street dealer ... a common tale was [that] the person dropped a bag and ran as the officers approached....*

Officers reported a litany of manufactured tales. For example, when officers unlawfully stop and search a vehicle because they believe it contains drugs or guns, officers will falsely claim in police reports and under oath that the car ran a red light (or committed some other traffic violation) and that they subsequently saw contraband in the car in plain view. To conceal an unlawful search of an individual who officers believe is carrying drugs or a gun, they will falsely assert that they saw a bulge in the person's pocket or saw drugs and money changing hands.

\To justify unlawfully entering an apartment where officers believe narcotics or cash can be found, they pretend to have information from an unidentified civilian informant or claim they saw the drugs in plain view... To arrest people they suspect are guilty of dealing drugs, they falsely assert that the defendants had drugs in their possession when, in fact, the drugs were found elsewhere where the officers had no lawful right to be....

Admitting the true facts of the arrest could lead to dismissal of the criminal charges and possibly to Departmental charges against the arresting officer. To many officers, this is a perversion of justice. In short, some officers falsify their arrest reports and, if necessary, their testimony to insure that the charges stick and that they are protected.

As with other forms of police corruption, *falsifications are most prevalent in high-crime precincts* where opportunities for narcotics and gun arrests abound. In such precincts, the prevalence of open criminal activity is high and the utility of an illegal search or arrest is perceived as great. Officers – often correctly – believe that if they search a particular person, or enter an apartment without a warrant, they will find drugs or guns. Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means, officers take the law into their own hands. And police falsification is the result.... *We found that such motivations to falsify are often present in narcotics enforcement units, especially to justify unlawful searches or arrests...*

The Commission also found that an officer's motives for purported legitimate-ends-falsifications often served as mere pretext for personal gain. *Unlawful arrests, for example, were sometimes conveniently timed to generate overtime pay for the arresting officer who typically took hours beyond his regular tour of duty to process the arrest.* "Collars-for-Dollars" is a practice widely known to officers, police supervisors, and prosecutors alike. In fact, a confidential report prepared by a prosecutor's office involving a pattern of police falsifications states that of the falsified arrests they investigated, "almost every arrest generated overtime pay

for the officer who lied about observations." *Besides overtime pay, high arrest numbers are often a factor considered for coveted assignments for patrol officers and supervisors alike.*

In one precinct we investigated, a cooperating officer told us of a regular pattern of "trading collars." The purpose of this practice was to accumulate overtime pay for the officers involved. In this scheme, the police officer who actually arrested the defendant would pass off the arrest to a colleague who was not involved or even present at the time of the arrest. Trading collars was done to maximize the overtime pay because the regular day off of the officer taking the arrest coincided with the likeliest date for a required court appearance. The officer who took the arrest would get all the details from the actual arresting officer, fill out the arrest papers, interview with the District Attorney, and, if necessary, testify to the circumstances of the arrest. This, despite the fact that the law requires the arresting officer to do this work. Officers perpetrated this scheme with the knowledge, approval, and in the presence of their sergeants. Another scheme to generate overtime was to have several officers and even supervisors state falsely that they recovered evidence incidental to an arrest. In this way, they insured that they would have to appear at the District Attorney's Office or before a grand jury on their day off and thus improperly receive overtime pay....

*Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors.* Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them. In testimony before the Commission, Kevin Hembury stated that one of his supervisors joked about how an arrest was manufactured:

> Question: Now you just said there was a supervisor or a lieutenant who joked about [police falsifications] in your presence?
>
> Hembury: That's correct, sir. Scenarios were, were you going to say (a) that you observed what appeared to be a drug transaction; (b) you observed a bulge in defendant's waistband; or (c) you were informed by a male black, unidentified at this time, that at that location there were drug sales.
>
> Question: So, in other words, what the lieutenant was telling you is: here's your choice of false predicates for these arrests?
>
> Hembury: That's correct. Pick which one you're going to use.

.... What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing

God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

Officers and their immediate supervisors are not the only culprits in tolerating falsifications. When officers genuinely believe that nothing is wrong with fabricating the basis of an arrest, a search, or other police action and that civil rights are merely an obstacle to aggressive law enforcement, the Department's top commanders must share the blame.

Indeed, we found that for years the Department was content to address allegations of perjury on a case-by-case basis, rather than pursuing the potential for a broader based investigation. *For example, supervisors were rarely, if ever, held accountable for the falsifications of their subordinates. We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch.*

*Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification.* The Commission's analysis of Internal Affairs' corruption categories – designed to quantify different kinds of police wrongdoing – revealed no separate category for perjury or falsification of records. Unlike other corruption categories, Internal Affairs over the last decade had no record of the number of falsification allegations brought against officers throughout the Department or in a particular precinct or command.

There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics.

Members of the law enforcement community, and particularly defense attorneys, told us that this same tolerance is sometimes exhibited among prosecutors. Indeed, several former and current prosecutors acknowledged – "off the record" – that perjury and falsifications are serious problems in law enforcement that, though not condoned, are ignored.

The form this tolerance takes, however, is subtle… a story that sounds suspicious to the trained ear; patterns of coincidences that are possible, but highly unlikely; inconsistencies that could be explained, but sound doubtful. In short, the tolerance the criminal justice system exhibits takes the form of a lesser level of scrutiny when it comes to police officers' testimony. Fewer questions are asked; weaker explanations are accepted.

* * * *

# AFTERWORD: THE NEGLECTED MOLLEN COMMISSION'S FINDING ON PERJURY, MANUFACTURED FACTS, AND FALSIFIED REPORTS

In 1992, in response to major police scandals, New York Mayor David Dinkins created a blue-ribbon commission to investigate police corruption. Headed by the eminent jurist Milton Mollen, the body was formally titled: *The City of New York Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department.* In July 1994, after spending two years conducting an extraordinary investigation of corruption within the New York Police Department, the Commission issued its lengthy and detailed report.

Although the Mollen Commission Report centered on the most flagrant and notorious forms of police corruption – officers who stole money and drugs, and then sometimes resold what they had stolen – it devoted one chapter to the more mundane but far more common forms of police corruption. The Commission called this form of corruption "falsification" and "perjury." The Commission Report focused on the innumerable cases when narcotics and patrol police and their supervisors routinely fabricated and falsified arrest reports and other police and court documents and testimony in order to make arrests.

Since 1994 – and contrary to the hopes of the Commission – many routine forms of fabricated police accounts have not diminished but increased. In particular, false police reports and testimony have become central to the arrest, jailing and prosecution of hundreds of thousands of mainly young black and Latino men simply for possessing small amounts of marijuana. And they are also central to the many times larger number of stop and frisks. All of which makes the Mollen report's findings about police falsification utterly relevant.

The Mollen Commission Report insisted that the source of police falsification and perjury lay in the NYPD's policing culture that was nurtured and sustained by its supervisors and top commanders.

Since 1994 the NYPD appears to have reduced some of the more unusual and egregious forms of corruption (such as gangs of rogue officers robbing people). At the same time, the NYPD has even further expanded and institutionalized many of the more common and routine forms of police falsification and fabrication. This falsification includes the widespread use of 'dropsy' arrests and similarly techniques – especially by narcotics squads and patrol police making arrests for marijuana possession, trespassing, disorderly conduct, and other misdemeanors.

All of this the Mollen Report described and warned about in 1994, long before New York City began making the scandalous 600,000 Stop & Frisks and 50,000 marijuana possession arrests a year, mainly of black and Latino teenagers and young men.

*- Harry G. Levine, Sociology Department, Queens College, City University of New York.*
*This was first created in the Spring of 2008. It was put on the web in May 2012 at:*
*www.marijuana-arrests.com/docs/Mollen-Excerpts-Falsification.pdf in May 2012*